LAWRENCE BREWSTER, Regional Solicitor
BRUCE L. BROWN, WSBA #18844
Associate Regional Solicitor
brown.bruce.l@dol.gov
JEREMIAH MILLER, WSBA #40949
Trial Attorney
miller.jeremiah@dol.gov
U.S. Department of Labor, Office of the Solicitor
1111 Third Avenue, Suite 945
Seattle, Washington 98101
Phone (206) 553-0940
Fax (206) 553-2768
Attorneys for Plaintiff Hilda L. Solis

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br>        Plaintiff,<br><br>v.<br><br>VELOCITY EXPRESS, INC., a corporation; JEFFREY HENDRICKSON, an individual; VINCENT WASIK, an individual,<br>        Defendants. | CASE NO. CV-09-864-MO<br><br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

COMES NOW Plaintiff HILDA L. SOLIS, Secretary of Labor, through the undersigned counsel, and submits this memorandum in support of her motion for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. Plaintiff requests that the Court grant summary judgment on the issues of Defendants Vincent Wasik's and Jeffrey Hendrickson's status as an "employer" for any persons employed by Velocity Express, Inc. ("Velocity Express") under Section 3(d) of the Fair Labor Standards Act (29 U.S.C. §§ 201-219; "FLSA" or "the Act"). This request should be granted because there are no issues of material fact as to whether or not Mr. Wasik or Mr. Hendrickson exercised sufficient control over the operations of Velocity Express to qualify as employers.

## I. Facts

### A)    Vincent Wasik

From 2003 to November 25, 2009, Vincent Wasik served as Chief Executive Officer ("CEO") and Chairman of the Board ("Chairman") for Velocity Express, Inc. ("Velocity Express"). Concise Statement of Facts, ¶ 1. Mr. Wasik held the same titles at Velocity Acquisition I, LLC, which had acquired Velocity Express' business, from November 25, 2009 to February 11, 2010. Id. As Chairman and CEO, Mr. Wasik had general control of the business of Velocity Express, including control over corporate governance, the mission and the corporate strategy for Velocity Express. Id. at ¶¶2-3. Mr. Wasik had the ultimate authority to make decisions regarding corporate governance. Id. at ¶3. As a part of Mr. Wasik's duties for Velocity Express, he identified potential areas of expansion for Velocity Express' business and interacted with large corporate clients. Id. at ¶¶4-5. As Chairman, Mr. Wasik had the authority to call meetings of the Board of Directors for Velocity Express and to preside at those meetings; he also had the power to preside a stockholder's meetings. Id. at ¶¶6-7.

After being brought in as Chairman and CEO, Mr. Wasik assembled his chosen corporate executive team at Velocity Express. Id. at ¶8. Mr. Wasik approved and/or selected the President, Chief Operating Officer, Chief Financial Officer, Legal Counsel, Executive Vice President of Sales and Executive Vice President of Human Resources. Id. at ¶9. Velocity Express' top executives reported to Mr. Wasik; including at least the President, Chief Operating Officer, Chief Financial Officer, Executive Vice President of Human Resources and Executive Vice President of Sales. Id. at ¶10. Mr. Wasik also made a variety of personnel decisions, including the decision to eliminate a divisional president shortly before Velocity Express declared bankruptcy. Id. at ¶11.

Mr. Wasik played a very significant role in the financial aspects of Velocity Express' operations. As Chairman and CEO of Velocity Express, he invested $5,000,000.00 of his own money. Id. at ¶12. Further, Mr. Wasik was retained as Chairman and CEO, in part, to address Velocity Express' financial turmoil. Id. at ¶13. According to Mr. Wasik, around the time that he was retained as Chairman and CEO, a public accounting of Velocity Express indicated that the company was in dire financial straits. Id. Mr. Wasik was instrumental in making the decision to continue business operations and in seeking new investors to prevent Velocity Express from being forced to declare bankruptcy. Id. at ¶ 14. Mr. Wasik was financially rewarded by Velocity Express, in part, for keeping the company from becoming insolvent. Id. at ¶15. Apart from raising funds to continue Velocity Express' operations, Mr. Wasik was heavily involved in the expenditure of Velocity Express' funds. As noted *supra*, Velocity Express' Chief Financial Officer reported to Mr. Wasik. Id. at ¶10. Further, Mr. Wasik was a signatory on Velocity Express' corporate bank accounts, and had to approve any financial transaction in excess of $50,000.00. Id. at ¶¶16-17. In evaluating the expenditures on behalf of Velocity Express, Mr.

Wasik was aware of the costs associated with paying delivery drivers for work they performed for Velocity Express. Id. at ¶18. In fact, Mr. Wasik indicated that costs associated with paying delivery drivers were the single largest expenditure for Velocity Express. Id.

Mr. Wasik's attempts to keep Velocity Express from declaring bankruptcy also included significant actions with regard to delivery drivers. In 2003, Mr. Wasik made the decision to eliminate the remaining 300 to 500 delivery drivers retained by Velocity Express that Velocity Express classified as employees. Id. at ¶19. This decision saved Velocity Express between $5,000,000.00 and $7,000,000.00 per year. Id. One of Mr. Wasik's subordinates, the Executive Vice President of Workforce Resources, constructed and implemented the plan to eliminate the remaining delivery drivers classified by Velocity Express as employees. Id. at ¶20. Mr. Wasik reviewed and approved the details of that plan. Id. The Executive Vice President of Workforce Resources is also responsible for approving the payment of delivery drivers, and provided training to managers regarding avoiding an employee classification for the drivers. Id. at ¶21-22.

B) **Jeffrey Hendrickson**

Mr. Wasik recruited Jeffrey Hendrickson to be Velocity Express' President and Chief Operating Officer ("COO") in late 2003 or early 2004. Id. at ¶23. As President and COO, Mr. Hendrickson was responsible for the day-to-day operations of Velocity Express. Id. at ¶24. Mr. Hendrickson had responsibility for major personnel decisions including the decision to add or eliminate job categories. Id. at ¶ 25. According to the bylaws in effect during Mr. Hendrickson's tenure as President, he was empowered to execute contracts under the seal of Velocity Express. Id. at ¶26. In the event that Mr. Wasik was unavailable, Mr. Hendrickson was empowered to act as the Chairman and CEO. Id. at ¶27. Mr. Hendrickson's duties extended to merging or closing facilities used for Velocity Express' operations. Id. at ¶ 28. In connection

with those duties, Mr. Hendrickson approved financial transactions exceeding $15,000 in value. Id. at ¶29. Mr. Hendrickson was personally invested in Velocity Express. Id. at ¶30.

Mr. Hendrickson exercised control over Velocity Express' day to day operations through the five divisional presidents who were responsible for geographic areas of Velocity Express' nation-wide operation. Id. at ¶31. An Executive Vice President of Operation Services also reported to Mr. Hendrickson. Id. As a part of the control he exercised over Velocity Express, Mr. Hendrickson closely monitored the elimination of the remaining 300 to 500 delivery drivers classified by Velocity Express as employees. Id. at ¶32.

## II. Authority

**A)** **Summary Judgment**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure a court may grant summary judgment if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); *see also* Cleary v. News Corp., 30 F.3d 1255, 1259 (9th Cir. 1994). It is the substantive law that will determine which facts are material to the outcome of a case. Anderson, 477 U.S. at 250.

The moving party has the burden of informing the court of the basis of its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *See* id.; Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 883 (9th Cir. 1982), *cert. denied* 460 U.S. 1085 (1983). If the moving party satisfies its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The court must then resolve all ambiguities and draw all reasonable inferences against the moving

party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). When the court concludes that no rational finder of fact can find in favor of the non-moving party, summary judgment should be granted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994). "On a motion for summary judgment neither [the Ninth Circuit] nor the trial courts are permitted to weigh the evidence, pass upon credibility, or speculate as to ultimate findings of fact." Pepper & Tanner Inc. v. Shamrock Broadcasting Inc., 563 F.2d 391, 393 (9th Cir. 1977).

**B)**    **"Employers" within the meaning of the FLSA**

    **1. Generally**

According to the FLSA, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "[T]he definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' and 'is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'" Lambert v. Ackerley, 180 F.3d 997, 1012 (9th Cir. 1999) (*en banc*) *cert. denied* 528 US 1116 (2000) (quoting Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983), *overruled on other grounds in* Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528 (1985)); Real v. Driscoll Strawberry Assocs., 603 F.2d 748, 754 (9th Cir. 1979). To ensure that workers are properly compensated under the law, "[t]he FLSA contemplates several simultaneous employers, each responsible for compliance with the Act." Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998) (quoting Falk v. Brennan, 414 U.S. 190, 195 (1973)). Any of these employers who violate the provisions of the FLSA "shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. §

216(b); *see also* Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983) (corporate officers of an employer corporation who qualify as employers are jointly and severally liable with that corporation).  Whether an individual is an employer under the FLSA is a question of law.  Patel v. Wargo, 803 F.2d 632, 634 (11th Cir. 1986); Bonnette, 704 F.2d at 1469.

A person who has "managerial responsibilities" and "substantial control of the terms and conditions of the [employee's] work" is an employer within the meaning of the Act.  Falk, 414 U.S. at 195.  "Where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability."  Boucher v. Shaw, 572 F.3d 1087, 1091 (9th Cir. 2009) (quoting Lambert, 180 F.3d at 1012).

### 2. Corporate Officers

With regard to corporate officers, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."  Agnew, 712 F.2d at 1511.[1]  Ultimately, both a corporation *and* its officers have an obligation under the Act to pay employees for the overtime that they work.  *See* Harper v. Wilson, 302 F.Supp.2d 873, 883 (N.D. Ill. 2004).  Elements weighing in favor of finding that an individual corporate officer is an employer include "the significant ownership interest of the corporate officers; their operational control of significant aspects of the corporation's day to day functions,

---

[1] Other courts holding that a corporate officer may be an employer for the purposes of the FLSA:  Baystate, 163 F.3d at 677-78 and n.12-13; U.S. Dep't of Labor v. Cole Enters. Inc., 62 F.3d 775, 778-79 (6th Cir. 1995); Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965-66 (6th Cir. 1991); Donovan v. Grim Hotel Co., 747 F.2d 966, 971-72 (5th Cir. 1984) *cert. denied* 471 US 1124 (1985); Donovan v. Sabine Irrigation Co., 695 F.2d 190, 194-95 (5th Cir. 1983) *cert. denied* 463 U.S. 1207 (1983); *see also* Miller v. Maxwell's Int'l Inc., 991 F.2d 583, 589 (9th Cir. 1993) (Fletcher, J., dissenting) ("[t]here can be no question that an individual can be personally liable as an employer under the FLSA.").

including compensation of employees; and the fact that they personally made decisions to continue operating the business despite financial adversity …." Baystate, 163 F.3d at 677-78 (citing Agnew, 712 F.2d at 1511-14); *see also* Lambert, 180 F.3d at 1012 (approving a similar jury instruction).

It is not necessary for the corporate officer to exercise direct supervision or control over employees to qualify as an employer. As one court put it, "[i]t is well established that a corporate officer without direct daily supervisory responsibilities over employees can still qualify as an employer under the FLSA." Chao v. Pacific Stucco, Inc., 2006 WL 2432862 at *5 (D. Nev. 2006) (citing Herman v. RSR Security Services, Ltd., 172 F.3d 132, 139 (2nd Cir. 1999)). Nor is it required that the employer corporate officer have exclusive control over the corporation's day-to-day operations. *See* Elliot Travel, 942 F.2d at 966; *see also* Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1161 (11th Cir. 2008).

### 3. Continuing Operations in Spite of Financial Adversity

Courts have found that corporate officers involved in the decision to continue operations in the face of financial adversity were employers under the Act. In Agnew, individual liability was found where, *inter alia*, the corporate officers supervised corporate cash flow and made payroll arrangements and decisions about layoffs and employees' hours during a difficult economic time for the company. Baystate, 163 F.3d at 678 n.12 (citing Agnew, 712 F.2d at 1511). The Baystate court described the rationale for this "economic reality" analysis as follows:

> Agnew's economic reality analysis focused on the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits. In addition to direct evidence of such a role, other relevant indicia may exist as well-for example, an individual's operational control over significant aspects of the business and an individual's ownership interest in the business. *See, e.g.*, [Agnew, 712 F.2d] at 1511-14. Such indicia, while not dispositive, are important to the analysis because they suggest that an individual controls a corporation's

>financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA.

Baystate, 163 F.3d at 678. Similarly, in Sabine Irrigation, the Fifth Circuit upheld a District Court's determination that a corporate officer was an employer for the purposes of the Act due, in part, to the fact that the corporate officer's activities allowed the corporation to stave off bankruptcy. Sabine Irrigation, 695 F.2d at 196. The court specifically approved of the District Court's reasoning that the "financial gymnastics directly affected Sabine's employees by making it possible for Sabine to meet its payroll and keep its employees supplied with the equipment and materials necessary to perform their jobs" supported classifying the corporate officer as an employer. Id. (quoting Donovan v. Sabine Irrigation Co., Inc., 531 F.Supp. 923, 929 (W.D. La 1981)).

### III. Argument

Vincent Wasik and Jeffrey Hendrickson both qualify as employers for the purposes of the FLSA.

Mr. Wasik and Mr. Hendrickson were both personally financially invested in Velocity Express; Mr. Wasik had invested $5,000,000.00 at the time of his retention as Chairman and CEO. This investment created an individual incentive for Mr. Wasik and Mr. Hendrickson to generate profits for Velocity Express, even at the expense of the corporation's employees. *See* Baystate, 163 F.3d at 677-78.

Other indicia that Mr. Wasik had sufficient control over the corporation to establish his status as employer for the purposes of the FLSA include: (1) according to the operative corporate bylaws, Mr. Wasik had general control over Velocity Express' business; (2) he functioned as Velocity Express' chief corporate officer (*see* Elliot Travel, 942 F.2d at 966; *see also* Chao v.

Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007)); (3) Mr. Wasik guided the general strategy and vision of Velocity Express (*see* Grim Hotel, 747 F.2d at 972); (4) Mr. Wasik was a signatory on corporate bank accounts (*see* Cole Enters., 62 F.3d at 778); (5) Mr. Wasik hired and retained the managerial staff that oversaw Velocity Express' interactions with its employees (*see* RSR Security Services, 172 F.3d at 140); (6) Mr. Wasik held the purse strings for the corporation (he had to approve significant financial transactions) (*see* Grim Hotel, 747 F.2d at 972); and (7) Mr. Wasik made the decision to eliminate the remaining delivery drivers classified as employees (saving Velocity Express millions of dollars per year), and oversaw the implementation of the process to eliminate those delivery drivers.

Perhaps most telling, Mr. Wasik was heavily involved in continuing operations despite the fact that Velocity Express' financial condition was poor. Mr. Wasik spent much of his time raising money and reassuring investors to allow Velocity Express to continue operations; these activities made it possible for Velocity Express to continue to employ employees. Mr. Wasik's efforts were significant in ensuring that Velocity Express remained afloat; Mr. Wasik was even rewarded for his ability to raise money to continue operations. *See* Baystate, 163 F.3d at 678; *see also* Sabine Irrigation, 695 F.2d at 196.

Additionally, Mr. Hendrickson exercised control over the operations of Velocity Express to such an extent that he was effectively an employer of Velocity Express' employees. *See* Baystate, 163 F.3d at 675 (FLSA contemplates more than one simultaneous employer). Mr. Hendrickson was empowered to act in Mr. Wasik's place when he was absent. *See* Olivas v. Little Havana Check Cash, Inc., 324 Fed. Appx. 839, 845-846 (11th Cir. 2009)). Mr. Hendrickson was empowered to act in the name of the corporation, executing transactions that required the corporate seal. Mr. Hendrickson also served as the President and COO, giving him

control of the day to day operations of Velocity Express.  *See* Shaw, 572 F.3d at 1091; *see also* Baker v. D.A.R.A. II, Inc., 2008 WL 191995 at *8 (D. Ariz. 2008).  Further, he had control over Velocity Express' coffers with respect to operations as he had to approve transactions in excess of $15,000.  *See* Grim Hotel, 747 F.2d at 972.  Mr. Hendrickson had control over the opening and closing of facilities; and, through his subordinates, Mr. Hendrickson controlled most aspects of the employment relationship with Velocity Express' employees at the city level.  This supervision extended to reviewing payments made to employees and deciding whether to keep various categories of employees.  Mr. Hendrickson also oversaw the implementation of the plan to eliminate the remaining delivery drivers classified as employees.

## IV. Conclusion

Ultimately, both Vincent Wasik and Jeffrey Hendrickson had sufficient economic control over the operations of Velocity Express to qualify as employers, jointly and severally liable with Velocity Express for any violations of the FLSA with regard to Velocity Express' employees.  Mr. Wasik was the head of Velocity Express at times relevant to the Complaint.  He was also personally heavily invested in Velocity Express.  As the Chairman and CEO, Mr. Wasik had general control of the operations of Velocity Express; this control extended to important personnel decisions, including the decision to eliminate delivery drivers classified as employees.  Most importantly, he was instrumental in continuing Velocity Express' operations despite its dire financial conditions.  Likewise, Mr. Hendrickson was President and COO of Velocity Express at times relevant to the Complaint.  He was also personally invested in Velocity Express.  Mr. Hendrickson controlled significant aspects of Velocity Express' day to day operations, including personnel practices and facilities decisions.

As there are no genuine issues as to the material facts set forth in this memorandum, the Secretary respectfully submits that her motion for Partial Summary Judgment should be granted.

Dated:  May 7, 2010

                          M. PATRICIA SMITH
                          Solicitor of Labor

                          LAWRENCE BREWSTER
                          Regional Solicitor

                          BRUCE L. BROWN
                          Associate Regional Solicitor

                          JEREMIAH MILLER
                          Trial Attorney

        By:    s/ Jeremiah Miller
                          JEREMIAH MILLER, WSBA #40949

Attorneys for Plaintiff Hilda L. Solis,
Secretary of Labor
United States Department of Labor
Office of the Solicitor
1111 Third Avenue, Suite 945
Seattle, Washington 98101
Phone (206) 553-0940
Fax (206) 553-2768
E-mail: miller.jeremiah@dol.gov