UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**HILDA SOLIS, Secretary of Labor,**
**United States Department of Labor,**

No. CV 09-864-MO

Plaintiff,

OPINION AND ORDER

v.

**VELOCITY EXPRESS, INC.; JEFFREY**
**HENDRICKSON; VINCENT WASIK,**

Defendants.

**MOSMAN, J.,**

The Secretary of Labor filed this lawsuit against defendants Velocity Express, Inc.,

Vincent Wasik, former Velocity Express CEO and Chairman of the Board, and Jeffrey

Hendrickson, former Velocity Express COO and President, for defendants' alleged failure to pay

overtime wages to their delivery drivers as required by the Fair Labor Standards Act ("FLSA"),

29 U.S.C. §§ 201-219. The Secretary now moves for partial summary judgment on the question

of whether Mr. Wasik and Mr. Hendrickson meet the FLSA's definition of an "employer." For

the reasons set forth below, I find the Secretary has not met her burden to show that Mr. Wasik

and Mr. Hendrickson exercised operational control over terms and conditions of employment

such that the corporation's violations of the FLSA are attributable to them personally. I therefore

DENY the Secretary's Motion for Summary Judgment (#44). Because the parties agree that

defendants' employer status is a question of law susceptible to resolution through summary

judgment, and because the undisputed facts show that Mr. Wasik and Mr. Hendrickson did not

act as employers under the FLSA, I GRANT summary judgment in favor of Mr. Wasik and Mr.

Hendrickson.

### BACKGROUND

During the relevant time period, July 27, 2007, to July 28, 2009, Velocity Express was a

national delivery corporation with over a hundred locations throughout the United States and two

to four hundred million dollars in revenue. (Wasik Dep. 15:6-10; 17:1-8, Mar. 26, 2010.)[1] The

company was overseen by a board of directors and its shares were publicly traded on NASDAQ.

(*Id*. at 13:2-24; 21:5-10.) Mr. Wasik became the company's CEO and Chairman of the Board in

July 2003. (*Id.* at 9:11-16.) Mr. Hendrickson was hired as Velocity's COO and President in early

2004. (*Id.* at 45:21-46:3.) These corporate officers answered to the Board of Directors and

stockholders while supervising a multi-layered management structure that included city

managers, network vice presidents, divisional vice presidents, and executive vice presidents. (*See*

Lindvall Dep. 20:13-21:20, Apr. 12, 2010; Pl.'s CSMF (#45) ¶ 25.) During their tenure at

Velocity Express, Mr. Wasik and Mr. Hendrickson focused primarily on improving the

company's tenuous financial situation. (Pl.'s CSMF (#45) ¶ 13.) The company's financial

situation did not improve, however, and Velocity Express filed for bankruptcy in late 2009.

(Wasik Dep. 9:17-24.) Neither Mr. Wasik nor Mr. Hendrickson is currently employed by

---

[1]  Relevant portions of cited deposition testimony can be found in the exhibits that
accompany Plaintiff's Concise Statement of Material Fact ("CSMF" (#45)).

Velocity Express.

The Secretary alleges that the defendants in this case failed to compensate delivery drivers at the Portland, Oregon facility at the appropriate overtime rate and failed to maintain mandatory employment records. (First Am. Compl. (#3) ¶¶ VII-VIII.) Defendants argue that their delivery drivers acted as independent contractors, not as employees to whom defendants would owe overtime and record-keeping obligations under the FLSA. (Answer (#13) 5.) Whether the delivery drivers at the Portland, Oregon facility acted as employees or independent contractors is the subject of a separate Motion for Summary Judgment (#48) currently pending before the Court.[2]

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the record in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A defendant's status as an employer under the FLSA is a question of law, but the legal determination rests on "subsidiary factual [findings]." *See Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 539 (1985). In this case, the question of Mr. Wasik's

---

[2] Defendants' decision to convert employees to independent contractors is included in the analysis of whether defendants can be deemed employers under the FLSA. In the context of this opinion, the Court does not decide whether the conversion was successful—that is, whether the workers at issue in this case should be deemed employees or independent contractors within the meaning of the FLSA.

and Mr. Hendrickson's employer status under the FLSA is particularly susceptible to resolution at summary judgment because the parties agree on the material subsidiary facts.

## DISCUSSION

Only "employers" are liable for violations of the FLSA. The FLSA defines an "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Under Ninth Circuit precedent, this definition should "be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999). An individual may be personally liable for FLSA violations if he or she "exercises control over the nature and structure of the employment relationship," or "economic control over the relationship." *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (internal quotation omitted). The analysis must include the "circumstances of the whole activity," with a particular focus on the "economic reality" of the employment relationship." *Id.*

It is well-established that a corporate officer may qualify as an employer if he or she had a "significant ownership interest [in the corporation] with operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; the power to determine salaries; [or] the responsibility to maintain employment records." *Lambert*, 180 F.3d at 1012 (internal alterations omitted); *see also Hale v. Arizona*, 993 F.2d 1387, 1394 (9th Cir. 1993) (suggesting that courts "consider the totality of the circumstances of the relationship, including whether the alleged employer has the power to hire and fire the employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records"). A similar rule is applied in circuit courts

throughout the country. *See, e.g.*, *Chao v. Hotel Oasis, Inc.*, F.3d 26, 34 (1st Cir. 2007); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999); *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 778-79 (6th Cir. 1995).

The Secretary bears the burden of proving that these defendants meet the FLSA's definition of an employer. *See Kowalski v. Kowalski Heat Treating, Co.*, 920 F. Supp. 799, 806 (N.D. Ohio 1996). To meet that burden, the Secretary identifies two primary areas in which Mr. Wasik and Mr. Hendrickson exercised control over the terms and conditions of employment at Velocity Express. First, she argues that Mr. Wasik and Mr. Hendrickson each had a significant personal financial interest in the company and exercised financial control over the corporation. Second, the Secretary asserts that Mr. Wasik and Mr. Hendrickson, as CEO and COO, respectively, exercised "general control over Velocity Express' business" and its corporate strategy. (Pl.'s Mem. in Supp. (#46) 8.) Specifically, their authority included hiring, retaining, and supervising the executives and managers who handled the majority of the day-to-day employment decisions. (Pl.'s Reply (#67) 2.) The Secretary also alleges that Mr. Wasik and Mr. Hendrickson made the decision to convert employees to independent contractors and then oversaw that transition. (*Id.*)

The Secretary's analysis of factors would make almost any corporate officer of any company an employer for FLSA purposes, since at least one corporate officer at every company is either involved in employment decisions or supervises someone who is involved employment decisions. Because Congress did not intend that "any supervisory or managerial employee of a corporation could be held personally liable for the unpaid wages of other employees," *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998), I analyze the *Lambert* factors

with the understanding that Congress did not intend corporate officers to be individually liable

for FLSA violations absent the kind of unusual circumstances highlighted in case law. For the

reasons that follow, I conclude that the Secretary has failed to meet her burden to show that either

Mr. Wasik or Mr. Hendrickson exercised financial or operational control over employment

relationships at Velocity Express such that they may be held personally liable for Velocity

Express's alleged failure to pay overtime wages.

I.      **Economic Control over the Employment Relationship**

        A corporate officer may be deemed an employer under the FLSA if he or she exercises

significant economic control over the employment relationship. *See Boucher*, 572 F.3d at 1091

(extending the definition to individuals who exercise "economic control over the [employment]

relationship"); *Cole Enters.*, 62 F.3d at 778 (determining that a defendant who held "a significant

ownership interest" in the company and exercised "operational control of significant aspects of

the corporation's day to day functions" was an employer under the FLSA). The undisputed facts

of this case, however, do not show that Mr. Wasik or Mr. Hendrickson exercised the kind of

economic control over employment relationships at Velocity Express that gives rise to personal

liability under case law.

        In determining that a corporate officer's economic control over a corporation made the

officer an "employer" under the FLSA, courts have identified an economic reality in which the

employment decisions of the business entity are indistinguishable from the employment

decisions of individual officers. *See, e.g.*, *Boucher*, 572 F.3d at 1091 (noting that defendant

corporate officers collectively held 100% ownership interest in the corporation); *Cole Enters.*, 62

F.3d at 778 (affirming the district court's finding that the defendant owned 50% of the

corporation); *Dole v. Elliot Travel & Tours*, 942 F.2d 962, 966 (6th Cir. 1991) (noting that the

defendant co-owned the corporation with his wife); *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st

Cir. 1983) (noting that the two defendants "together were President, Treasurer, Secretary and sole

members of the Board of Directors")*; Dole v. Solid Waste Servs., Inc.*, 733 F. Supp. 895, 900-01

(E.D. Pa. 1989) (finding three corporate officers jointly and severally liable as employers under

the FLSA where those three officers collectively owned and controlled the corporation). In this

way, the expansive FLSA employer definition prevents an officer from using the corporation to

shield himself from the consequences of violative conduct that is as attributable to the individual

as to the corporate entity.

The facts of this case do not support the Secretary's argument that Mr. Wasik or Mr.

Hendrickson held an ownership interest in the company that case law would deem significant for

purposes of determining liability under the FLSA. The Secretary does not dispute that Mr.

Hendrickson owned only 0.18% of stock in the company. (Watkins Decl. (#63) Ex. 5 at 9.) And

despite Mr. Wasik's five million dollar investment in Velocity Express, it is undisputed that he

owned only a 0.85% share in the company as of September 1, 2009.[3] (*Id.* at 8.) Neither of these

interests comes close to showing a "significant ownership interest" of the kind that would give a

corporate officer economic control over the corporation. *See Cole Enterprises,* 62 F.3d at 778;

*see also Smith v. The Cheesecake Factory Rests.*, No. 3:06-00829, 2010 WL 441562, at \*13

(M.D. Tenn. Feb. 4, 2010) (finding that a 4.8% ownership interest did not qualify as a significant

ownership interest under case law). Therefore, although an individual may be deemed an

---

[3] There is no evidence in the record as to Mr. Wasik's ownership interest at the time of his initial investment.

employer even in the absence of a substantial ownership interest, *see Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993), Mr. Wasik's and Mr. Hendrickson's negligible ownership interests in Velocity Express strongly suggest that they did not act as FLSA employers.

I am similarly unpersuaded by the Secretary's argument that Mr. Wasik and Mr. Hendrickson exercised financial control over the employment relationship because they were empowered to authorize large corporate expenditures and execute transactions requiring the corporate seal. (*See* Pl.'s CSMF (#45) ¶¶ 16-17; 29.) These corporate powers bear no discernable relationship to day-to-day employment decisions at Velocity Express, let alone the employment decisions that allegedly violated the FLSA. In the context of a large, publicly traded corporation, proof of general financial powers does not demonstrate the kind of economic control over the employment relationship that is emphasized in case law. *See RSR Sec. Servs.*, 172 F.3d at 136 (defendant exercised financial control over the company because "he was the only principal who had bank credit" and "could have unilaterally dissolved" the company if the other principals had not followed his instructions); *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (defendant "had a significant ownership interest in [the business] . . . determined salaries and made hiring decisions"); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 n.7 (5th Cir. 1984) (defendant had "ultimate control over wages" and was the only person "who could authorize compliance with the Fair Labor Standards Act"); *De Guzman v. Parc Temple LLC*, 537 F. Supp. 2d 1087, 1094 (C.D. Cal. 2008) (defendant "hired plaintiff," "set plaintiff's work schedule," "determined plaintiff's rate and method of payment, and signed the payroll checks").

Likewise, the Secretary's observation that Mr. Wasik chose to continue business

operations in the face of economic adversity answers only half of the relevant inquiry. Where cases suggest that liability could be anchored to such a scenario, the decision to continue operations has been related to the alleged violation of the FLSA. *See Baystate*, 163 F.3d at 678 ("At bottom, [the] economic reality analysis focuse[s] on the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits."). Beyond the decision to replace the company's remaining employees with an independent contracting arrangement, which is discussed in greater detail below, the Secretary's evidence shows no relationship between Mr. Wasik's efforts to keep Velocity Express in business during times of financial hardship and the employment decisions that led Velocity Express to undercompensate its employees.

Accordingly, none of Mr. Wasik's or Mr. Hendrickson's financial powers suggests an economic reality in which either individual "act[ed] directly or indirectly in the interest of an employer in relation to an employee." *See* 29 U.S.C. § 203(d).

## II.   <u>Control over Nature and Structure of the Employment Relationship</u>

Under the FLSA's expansive definition, a corporate officer may be personally liable as an employer even if he or she does not directly supervise employees. *RSR Sec. Servs.*, 172 F.3d at 139 (contemplating liability in cases where the alleged employer exercises "restricted" or "occasional[]" control over the employment relationship). A corporate officer's personal liability for the employment decisions of subordinate executives lies at the very outer boundaries of employer liability under the FLSA, however. On this record, the Secretary can prove that some executives who made operational day-to-day employment decisions reported directly to either Mr. Wasik or Mr. Hendrickson. In the absence of any evidence indicating that Mr. Wasik or Mr.

Hendrickson made or influenced an employment decision that led directly to the FLSA violations

at issue in this case, however, I find that the supervisory relationship between these corporate

officers and the delivery workers is too attenuated to support personal liability under the FLSA.

A.       *Case Law Interpreting a Corporate Officer's Operational Control over the Employment Relationship*

When analyzing the economic reality of an employment relationship, courts pay particular

attention to whether the corporate officer's duties made him or her "principally in charge of

directing employment practices" such that the employer was "instrumental in 'causing' the

corporation to violate the FLSA." *Hotel Oasis*, 493 F.3d at 34; *see also Baystate*, 163 F.3d at

678. In each case cited by the Secretary for the proposition that a corporate officer may qualify as

an employer under the FLSA, the court identified the officer's personal responsibility for the

employment practices of the corporation. *See, e.g.*, *Hotel Oasis*, 493 F.3d at 34 (defendant "was

the corporate officer principally in charge of directing employment practices"); *Cole Enters.*, 62

F.3d at 778 (defendants "determined the employment practices for [their business], including

hiring, firing, rates of pay and hours of work"); *Baystate*, 163 F.3d at 678 (one defendant

"purchased insurance for the workers" and "gave directions to the workers about on-the-job

conduct," while the other defendant transported and paid the day workers *RSR Sec. Servs.*, 172

F.3d at 140 (defendant had authority to hire employees, as evidenced by his hiring of managerial

staff); *Circle C. Invs.*, 998 F.2d at 329 (defendant hired dancers, signed payroll checks, and gave

specific instructions to dancers regarding employment practices); *Elliott Travel & Tours, Inc.*,

942 F.2d at 966 (defendant "had control over significant aspects of the corporation's day-to-day

functions, including determining employee salaries"); *Agnew*, 712 F.2d at 1511 (defendants

"were actively engaged in the management, supervision and oversight of [the company's] affairs, including employee compensation and benefits"); *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 290-91 (E.D.N.Y. 2002) (defendants "set the work schedule," "determined the rate of pay for the employees," "hired employees," "prioritized work for employees and instructed employees as to aspects of their job").

But despite the wealth of authority supporting the proposition that a corporate officer may be liable for violations of the FLSA under certain circumstances, courts also recognize that Congress did not intend for "any corporate officer or other employee with ultimate operational control over payroll matters [to] be personally liable" under the Act. *Agnew*, 712 F.2d at 1513. As the First Circuit has recognized:

> If, as the Secretary argues, the significant factor in the personal liability determination is simply the exercise of control by a corporate officer or corporate employee over the "work situation," almost any supervisory or managerial employee of a corporation could be held personally liable for the unpaid wages of other employees and the civil penalty related thereto. We adhere to the view expressed in *Agnew* that such an expansive application of the definition of an "employer" to a personal liability determination pursuant to the FLSA is untenable.

*Baystate*, 163 F.3d at 679.

At its core, the economic reality analysis eschews analysis of isolated factors, focusing instead on "the role played by the corporate officers in causing the corporation to undercompensate employees." *Id.* at 678. In the absence of a direct relationship between the corporate officers' decisions and the FLSA violation at issue, courts have found that corporate officers in large publicly traded corporations did not become FLSA employers simply by virtue of their general authority over the company as a whole. *See Combs v. Greenfield*, No. C 09-06042 SI, at *2-3 (N.D. Cal. May 11, 2010) (distinguishing officers "with significant control over

at least one major aspect of their companies' employment-related practices" from the CEO and

COO of a national corporation who "play[ed] no role in creating, implementing, or supervising

the employment practices" at one of the corporation's many locations); *Cheesecake Factory*

*Rests.*, 2010 WL 441562, at *13 (determining that corporate officers of a publicly traded

company were not employers under the FLSA, despite their ownership interest and general

oversight responsibilities, because the officers did not have direct involvement in day-to-day

employment operations). In fact, the Court is aware of no case in which the senior officers of a

national, publicly traded corporation have been held liable as FLSA employers.

### B.       *Management Structure at Velocity Express*

The undisputed facts demonstrate that key operational employment decisions at Velocity

Express were made at multiple levels of management.  Unlike cases in which a defendant

personally hired the manager or managers who directly supervised employees, *see RSR Security*

*Services*, 172 F.3d at 140, there were at least four management layers—city managers, network

managers, division managers, and executive vice presidents—between the defendants in this case

and the delivery drivers who did not receive overtime pay. (*See* Lindvall Dep. 20:13-21:20; Pl.'s

CSMF (#45) ¶ 25.)

Mr. Wasik primarily delegated authority to executives in key positions who reported to

Mr. Wasik but retained "responsibility for their area." (Wasik Dep. 26:14-27:6.) Primary

authority for day-to-day employment decisions was held by Kay Durbin, the company's

Executive Vice President of Workforce Resources, who was hired by Mr. Wasik and reported to

him directly. (*Id.* at 30:4-31:9.) Ms. Durbin approved payment of delivery drivers, trained

managers regarding delivery drivers, and made personnel decisions. (Pls.' CSMF (#45) ¶¶ 21-22,

25.)  Network vice presidents, who reported to Mr. Hendrickson, also had authority over the

areas within their geographical networks. (Wasik Dep. 39:16-40:22; 46:15-47:17.) City managers

were responsible for direct day-to-day supervision of delivery drivers and warehouse workers.

(Lindvall Dep. 20:13-21:20.)

As CEO, Mr. Wasik's primary responsibility was "corporate governance, setting the

vision, the mission, the strategy of the company." (Pl.'s CSMF (#45) ¶ 3.) In practice, he focused

primarily on the financial health of the company and professed to be minimally involved in the

company's other operations. (Wasik Dep. 33:22-34:12.) Although he had authority over the

corporation as a whole, he also answered to the corporation's Board of Directors and to its

shareholders. (*See id.* at 10:18-24; 64:3-65:4.) With respect to day-to-day operations, Mr. Wasik

received reports about the "cost of delivery," but he did not receive specific reports about wages

paid to delivery drivers or other staff. (*Id.* at 49:2-14.) Payments to delivery drivers were

approved by the local manager, the network vice president, and Ms. Durbin. (*Id.* at 56:25-57:12.)

Theoretically, Mr. Wasik and Mr. Hendrickson exercised some degree of control over

employment decisions simply by virtue of their supervisory authority, which necessarily included

supervising executives responsible for employment decisions. What is missing from the

Secretary's evidence, however, is any indication that Mr. Wasik or Mr. Hendrickson actually

exercised operational control over Velocity Express's employment decisions, such that they could

be deemed responsible for the corporation's alleged violations of the FLSA. *See Baystate*, 163

F.3d at 678 (emphasizing the importance of identifying the officer's "personal responsibility for

making decisions about the conduct of the business that contributed to the violations of the

[FLSA]"). Although Mr. Wasik and Mr. Hendrickson both held ultimate supervisory authority,

the record contains no evidence that Mr. Wasik or Mr. Hendrickson used that authority to influence the employment decisions made by their subordinates.

The Secretary emphasizes that Mr. Wasik and Mr. Hendrickson were heavily involved in the decision to convert employees to independent contractors, and then oversaw the transition once a decision was made. But the Secretary has not provided the Court with any evidence that links Mr. Wasik's or Mr. Hendrickson's decisions to the FLSA violations alleged in this case. Defendants have shown that the initial decision to convert employees to independent contractors was made in 2000, shortly after Velocity Express's predecessor corporation, Corporate Express, merged with several smaller companies that it had acquired. (Defs.' Resp. to Pl.'s CSMF (#64) Objections ¶ 19; Additional Material Facts ¶ 3.) It is undisputed that several of these merged facilities, including the Portland, Oregon facility at issue in this lawsuit, were transitioned to an independent-contractor model *before* Mr. Wasik and Mr. Hendrickson joined the company. (Defs.' Resp. to Pl.'s CSMF (#64) Additional Material Facts at ¶¶ 2, 4.) By the time Mr. Wasik and Mr. Hendrickson joined Velocity Express, only 10% of the company's delivery drivers were still classified as employees. (Pl.'s CSMF (#45) ¶ 19; Defs.' Resp. to Pl.'s CSMF (#64) Objections at ¶ 19.) Although the record contains no evidence of the facility or facilities where these drivers were located, the Secretary has not met her burden to show that any of these drivers were located in Oregon or otherwise fall within the scope of this lawsuit. Therefore, even assuming that a corporate officer's liability could be premised on a decision to transition the corporation to an independent contractor model, here, the record shows no relationship between Mr. Wasik's or Mr. Hendrickson's involvement in the independent contractor transition and the alleged FLSA violations in this case.

Aside from a decision to convert a small number of employees to independent contractors an unknown facility, the record is devoid of evidence suggesting that Mr. Wasik or Mr. Hendrickson made a single decision with respect to employee work schedules, wages, or other day-to-day conditions of employment. *See Lambert*, 180 F.3d at 1012 (considering whether the corporate executive exercised "operational control of *significant* aspects of the corporation's day-to-day functions," including "the power to hire and fire employees; the power to determine salaries; [or] the responsibility to maintain employment records") (emphasis added) (alterations omitted). Personal liability for violations of the FLSA does not extend to this set of undisputed facts, in which control over the terms and conditions of employment was spread throughout the corporate organization and there is no evidence that Mr. Wasik or Mr. Hendrickson personally made a decision that can be traced to the alleged FLSA violations in this case. To hold otherwise would create de facto liability for high-level corporate officers any time a corporation violated the FLSA.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (#44) on the status of Vincent Wasik and Jeffrey Hendrickson as employers under the FLSA is DENIED. Because the record does not reveal a dispute of material fact on this limited issue, summary judgment is granted in favor of these two individual defendants.

IT IS SO ORDERED.

DATED this _26th_ day of July, 2010.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court