UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**HILDA SOLIS, Secretary of Labor,**
**United States Department of Labor,**

                    Plaintiff,

    v.

**VELOCITY EXPRESS, INC.,**

                  Defendant.

No. CV 09-864-MO

OPINION AND ORDER

**MOSMAN, J.,**

    During the relevant time period, from August 2007 until the company filed for bankruptcy in November 2009, Velocity Express was a national shipping company that provided package delivery services. The Secretary of Labor alleges that Velocity Express failed to compensate Oregon delivery drivers at the appropriate overtime rate as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219. (First Am. Compl. (#3) ¶¶ VII-VIII.) Velocity Express now moves for summary judgment on the ground that its delivery drivers acted as independent contractors, not as employees to whom defendant would owe overtime and record-keeping obligations under the FLSA. (Def.'s Mot. for Summ. J. (#48).) Based primarily on disputes of material fact regarding the extent to which Velocity Express exercised control over

the manner in which its delivery drivers worked, Velocity Express's motion is DENIED in part and DENIED AS MOOT in part.[1]

## FACTUAL BACKGROUND

In late 1999 and early 2000, Velocity Express's predecessor corporation, Corporate Express acquired several smaller shipping companies throughout the United States, including the Portland, Oregon facility that is the subject of this lawsuit. Corporate Express's merger with these acquired companies produced the entity known as Velocity Express. Around the time Velocity Express was created, a decision was made to standardize the different delivery models of the acquired companies, which included a decision to convert delivery drivers to independent contractors. By 2003, all delivery drivers at the Oregon facility were classified as independent contractors working under an Independent Contractor Agreement for Transportation Services.

The undisputed facts about Velocity Express's employment policies and practices are as follows. Velocity Express assigns the delivery drivers their routes, which are based either on a geographic area or specific customers. Within those assigned routes, the drivers have discretion to make stops in any order they wish, subject only to the timing demands of customers. The drivers dictate when they will take breaks, and they are allowed to run personal errands at any time. Velocity Express also provides drivers with "route sheets," which contain suggested stop times, and the drivers are required to submit verification of their completed deliveries. Drivers are also required to call the dispatcher at certain times to verify deliveries and to receive

---

[1] Velocity Express's motion is denied as moot to the extent it seeks a declaration that Vincent Wasik, former Velocity Express CEO, and Jeffrey Hendrickson, former Velocity Express COO, are not "employers" within the meaning of the FLSA. This issue was the subject of the Court's July 26, 2010, Opinion and Order (#72), in which summary judgment was granted in favor of Mr. Wasik and Mr. Hendrickson.

information about additional delivery opportunities, such as "on-demand deliveries." Although Velocity Express will ask drivers to accept on-demand deliveries in addition to their regular routes, or to accommodate a customer's request for a delivery at a certain time, the drivers are free to reject those requests without retaliation. The drivers provide their own vehicles, and they are responsible for their own vehicle insurance, cargo insurance, medical insurance, social security, and taxes. Delivery drivers are allowed to employ substitutes and assistants, as long as the helpers pass Velocity Express's background check. The Independent Contractor agreement does not contain a non-compete clause, and the drivers are permitted to work for other delivery companies. Delivery drivers wear Velocity Express uniforms and use Velocity Express signs on their vehicles only when required by the customer.

The disputed facts in this case center around a potential disconnect between Velocity Express's stated policies on one hand, and the practical application of those policies on the other. Several delivery drivers offered testimony that the sheer breadth of their route assignments created long, twelve- to fourteen-hour workdays while preventing the drivers from taking breaks or working for other companies. At least one driver declared that a Velocity Express manager or dispatcher required him or her to structure stops a certain way during his route. These drivers would also testify that they were required to arrive at a Velocity Express warehouse location at a certain time to sort packages, and that they did not have a "meaningful opportunity" to bid for routes or negotiate the rates they were paid for their routes.

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the record in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

Whether a worker is an "employee" under the FLSA is a question of law that rests on factual findings about the economic reality of a worker's relationship to his or her employer. *See Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1136 (N.D. Cal. 2009) ("The existence and degree of each factor [of the economic realities test] is a question of fact while the legal conclusion to be drawn from those facts . . . is a question of law.") (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)); *see also Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("The question of how [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law."). A dispute of material fact is not created merely by the existence of undisputed facts favoring each side's position, however. Instead, I look to whether the undisputed facts alone, or the undisputed facts in combination with disputed facts viewed in the light most favorable the Secretary, compel the conclusion that the delivery drivers operated as independent contractors.

## DISCUSSION

In evaluating whether the Secretary has met her burden to prove that a worker is an "employee" under the FLSA, courts look to the following factors:

(1)   The degree to which the employer exercised control over the manner in which the

    work is to be performed;

(2) The worker's opportunity to control his own profit or loss through managerial skill;

(3) The worker's investment in his or her business and his ability to employ substitutes or assistants;

(4) Whether the work requires a special skill and whether the work performed is integral to the employer's business; and

(5) The degree of permanence of the working relationship.

*Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981); *see also Torres-Lopez v. May*, 111 F.3d 633, 639-40 (9th Cir. 1997); *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979). No single factor is dispositive; rather, the court examines these factors, and the totality of the circumstances, in an effort to ascertain the "economic reality" of the employment relationship. *Driscoll Strawberry*, 603 F.2d at 754; *see also Superior Care, Inc.*, 840 F.2d at 1059 (considering "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves").

  An analysis of the first two factors reveals several substantial disputes of material fact, which, when viewed in the light most favorable to the Secretary, suggest that Velocity Express's control over its delivery drivers was akin to the control an employer exerts over an employee. While undisputed facts bearing on the third factor suggest that delivery drivers should be classified as independent contractors, the disputes of fact on the control factors, combined with the neutrality of the other factors, prevent me from determining the economic reality of the delivery drivers' employment status as a matter of law.

I.    **Control**

Because the degree of control an employer exercises over a worker generally bears an inverse relationship to the degree of control the worker has over her profits or losses, I analyze these two related factors together. Generally, a worker's control over his or her working conditions "is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312-13 (5th Cir. 1976), *quoted in Sureway Cleaners*, 656 F.2d at 1371.

Velocity Express has made a strong case that the delivery drivers should be classified as independent contractors because the company did not exercise control over the manner in which the delivery drivers performed their deliveries. This argument is based primarily on the following set of undisputed facts:

(1)    Delivery drivers were offered the opportunity to earn extra money by assuming on-demand deliveries in addition to their regularly assigned route, but the drivers had discretion to refuse on-demand deliveries and frequently did refuse such deliveries. (Dent Dep. 105:4-106:15; Mace Dep. 72:7-20.)[2]

(2)    Although Velocity Express assigned its delivery drivers a specific route, the driver was free to make those stops in any order he or she chose. (Dent Dep. 21:17-23:13; Mace Dep. 61:5-25.)

(3)    Delivery drivers were responsible for finding their own replacements in the event

---

[2] I deny Velocity Express's authentication objection to the transcripts, which is based on the absence of a reporter's certification. There is no genuine question as to the transcripts' authenticity. Counsel for plaintiff, who was present at each deposition, authenticated each transcript through an affidavit filed with the transcript. *See* FRCP 901(a); 901(b)(1), (4). Counsel later filed reporter certifications in response to Velocity Express's objection. (Pl.'s Sur-Reply (#70) Exs. 1-4.) Although Velocity Express identifies a technical defect in the way the deposition transcripts were presented to the Court, it provided no evidence to suggest that the deposition transcripts are not what they purport to be.

>   they were unable to complete their scheduled routes. (Dent Dep. 98:2-11; Mace Dep. 64:14-65:9.)
>
> (4)   Delivery drivers did not receive an employee code of conduct. (Dent Dep. 121:2-19.)
>
> (5)   Velocity Express did not prohibit delivery drivers from working for other shipping or package delivery companies, and drivers were authorized to employ substitutes and helpers as they saw fit. (Dent Dep. 133:17-134:5, 147:12-15; Pl.'s CSMF (#60) Ex. 7 at 1.)
>
> (6)   Delivery drivers were required to maintain their own commercial liability insurance, cargo insurance, and occupational accident coverage, but they could select their own insurance providers and policies. (Durbin Decl. ¶¶ 28.) Drivers were also responsible for their own tax payments (*id.* at ¶ 26), and for obtaining their own medical insurance (*id.* at ¶ 29.)
>
> (7)   Delivery drivers drove their own vehicles, and were responsible for their own gas, vehicle maintenance, and insurance. (Dent Dep. 108:21-24, 124:12-16; Mace Dep. 77:10-15.)
>
> (8)   At least some delivery drivers negotiated their rates of pay or number of stops to increase the profitability of their assigned routes. (Dent Dep. 145:17-146:19.)
>
> (10)  Delivery drivers were only required to wear Velocity Express uniforms and display Velocity Express signage if the customer required this kind of identification. Velocity Express did not impose its own uniform requirements independent of its customers. (Def.'s CSMF (#56) ¶ 18; Pl.'s CSMF (#60) Ex. 7 at 3-4.)

In her response, the Secretary argues that Velocity Express exercised control over its drivers regardless of its stated policies to the contrary. Many of the Secretary's factual assertions are disputed,[3] but, because the Secretary is the non-moving party, I view these facts in the light

---

[3] Velocity Express has challenged several witness declarations for lack of personal knowledge under Federal Rule of Evidence 602. Because the workers have personal knowledge of their own understanding of Velocity Express's employment practices and expectations, objections about the witnesses' failure to describe the foundation for their understanding goes to the weight of the evidence, not its admissibility. Accordingly, I construe Velocity Express's evidentiary objections as an indication that the declarations contain disputed issues of fact.

most favorable to the Secretary. Significantly, the Secretary presented evidence that:

(1) Delivery drivers did not bid for specific routes. Rather, drivers were assigned routes after signing their contracts. (Rose Decl. ¶ 8; Graham Decl. ¶ 8; Barton Decl. ¶ 8; Mummery Decl. ¶ 11.)

(2) The size of specific routes led to long, twelve- to fourteen-hour workdays and prevented the drivers from taking breaks, working for other delivery companies, or otherwise arranging their schedules. (Rose Decl. ¶¶ 7, 17; Barton Decl. ¶¶ 7, 15; Graham Decl. ¶¶ 3-4; Mummery Decl. ¶¶ 2, 10, 18.)

(3) A Velocity Express manager instructed delivery drivers to arrive at the company's warehouse at a certain time each day to sort packages. (Rose Decl. ¶¶ 5-6; Barton Decl. ¶¶ 5-6; Mummery Decl. ¶¶ 8-9.) One driver was reprimanded when he arrived to the warehouse late. (Rose Decl. ¶ 5.)

(4) Delivery drivers were required to wear Velocity Express uniforms and post a Velocity Express sign on their vehicles when required by the customer, which, practically speaking, meant that a drivers wore their Velocity uniform throughout the day.[4] (Rose Decl. ¶ 15; Graham Decl. ¶ 10; Mummery Decl. ¶ 14.)

(5) Delivery drivers were required to call dispatchers at the beginning and end of each shift to verify their deliveries, and some drivers were required to call in periodically during their routes. (Rose Decl. ¶ 12; Barton Decl. ¶ 10; Mummery Decl. ¶ 13.) At least one driver was "reprimanded for failing to call in at the required time." (Barton Decl. ¶ 10.)

(6) Delivery drivers received route sheets describing stops along the route and suggested times for those stops. (Dent Dep. 170:17-171:18; Rose Decl. ¶ 9; Graham Decl. ¶ 9; Barton Decl. ¶ 9; Mummery Decl. ¶ 12.) Velocity Express helped the drivers create these route forms. (Mace Dep. 108:18-109:5.) Only a small percentage of delivery drivers did not use or submit a route form. (Dent Dep. 171:2-18.) At least one delivery driver was told to rearrange his planned route to accommodate time-sensitive customer deliveries. (Graham Decl. ¶ 9.)

(7) If a delivery driver could not complete a route, and no substitute could be found, a

---

[4] Courts generally place little weight on a uniform requirement in the FLSA context, particularly where the uniform is "intended to ensure customer security rather than control" over a driver. *See Ruiz v. Affinity Logistics Corp.*, 697 F. Supp. 2d 1199, 1215 (S.D. Cal. 2010). Here, because it is undisputed that delivery drivers are required to wear a uniform or post a company sign on their vehicles only if the customer so requires, my decision places little weight on the Secretary's evidence of uniforms and signage.

        Velocity Express supervisor drove the route him or herself. (Dent Dep. 98:10-11; 132:20-25; Mace Dep. 65:21-66:9.)

(8)      In practice, few long-term delivery drivers renegotiated their rates of pay (Dent Dep. 144:2-148:7), and some drivers felt they did not have a meaningful opportunity to negotiate their pay (Mummery Decl. ¶ 3; Graham Decl. ¶¶ 2, 6, 8).

It is difficult to separate the facts that indicate Velocity Express controlled the manner in which work was to be performed from the facts that suggest nothing more than a contractual expectation between the parties. For example, the parties agree that delivery drivers were required to call a dispatcher at the beginning and end of their routes, and to submit route forms indicating which deliveries were completed. As a contracting party, Velocity Express had no obligation to pay for work that was not completed, and it had a right to verify, through some mechanism, that its drivers were only paid for deliveries that had actually been made. *See Herman v. Mid-Atlantic Installation Servs.*, 164 F. Supp. 2d 667, 672 (D. Md. 2000) ("It is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client. For example, a builder will build a building according to the specifications of an architect. That does not make the builder an employee."). The real question is not whether Velocity Express required its drivers to verify their deliveries, but whether the particular mechanism Velocity Express chose to verify deliveries—including daily calls to dispatchers and route forms—were also a means of exercising control over the manner in which the delivery drivers performed their work. In answering this question, courts give weight to facts that indicate a worker was required to contact the company at a certain time or in a certain way. *See Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300, 304 (E.D.N.Y. 2009) (finding it material that the driver was not required to report his deliveries to Velocity Express on a daily basis, did not use

forms supplied by Velocity Express, and did not submit any forms to Velocity Express); *Harris*, 656 F. Supp. 2d at 1138 (emphasizing that a company's policy of requiring salespeople to call the company's office daily created a dispute of material fact sufficient to preclude summary judgment). Here, the Secretary's evidence that Velocity Express required its drivers to submit specific route forms and check-in with the company daily—and sometimes more frequently—is evidence from which a reasonable trier of fact could find that Velocity Express's requirements were a means of exercising control over its delivery drivers rather than merely a means of verifying that the work was completed.

Another question of fact is whether the drivers' long work days and inability to take breaks or work for other companies is a function of Velocity Express's control over its workers or simply an unprofitable contractual bargain. Viewing the evidence in the light most favorable to the Secretary, a trier of fact could find that route selection was a meaningful way in which Velocity Express exerted control over its drivers. The Secretary's critical evidence on this issue is the testimony of delivery drivers who state that they received their route assignments *after* they contracted with Velocity Express. *Cf. EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 748 (7th Cir. 1998) (noting that "detailed specifications *in the [drivers'] transportation contracts* . . . set 'the precise route and schedule of each driver'" such that the drivers' schedules reflected each parties freedom to contract) (emphasis added). These witnesses suggest that the routes themselves dictated the drivers' schedules by imposing customer scheduling demands, forcing the drivers to work long hours, and preventing the drivers from taking breaks, running personal errands, or taking delivery jobs from other companies. Although the record clearly reflects that the drivers were free to terminate their contracts after providing written two-weeks notice, it is unclear on

this record whether, and the extent to which, drivers could refuse certain routes and choose others.

The Secretary's evidence also suggests that delivery drivers' limited control over their routes, hours, and total number of deliveries translated into limited opportunities to maximize profits and minimize losses through skill and initiative. The dispute of fact on this factor stands in stark contrast to the undisputed facts, and factual findings, of other cases that have identified an independent contractor relationship. *See Ruiz*, 697 F. Supp. 2d at 1210 (finding, after a bench trial, that a driver's ability to select a preferred route, and thereby control his hours spent working, weighed against a finding of employer control); *Mid-Atlantic Installation Servs.*, 164 F. Supp. 2d at 674 (reasoning that the workers' ability to "control their own profits and losses by agreeing to work more or fewer hours and, more importantly, by improving their technique" showed an "ability to generate more money based on skill and hard work" indicative of independent contractor status); *see also Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F. 3d 299, 302, 304 (5th Cir. 1998) (noting that a majority of delivery drivers worked for relatively short periods of time and had "no obligation to accept any specified number of jobs during any given period" and emphasizing that "the drivers had the ability to choose how much they wanted to work"). Moreover, although Velocity Express emphasizes the drivers' ability to negotiate their pay rates and routes, the degree to which drivers successfully negotiated to receive greater pay or to alter their routes is itself a disputed issue of material fact. (Dent Dep. 144:2-148:7; Mummery Decl. ¶ 3; Graham Decl. ¶¶ 2, 6, 8.) As the Ninth Circuit has counseled, "the test is not what the

'agent' could do but what in fact the 'agent' does do."[5] *Sureway Cleaners*, 656 F.2d at 1371.

Accordingly, a reasonable trier of fact could find that Velocity Express controlled the manner in which the delivery drivers' work was to be performed through the assignment of routes and customers, thereby limiting the drivers' opportunity to control their own profit and loss. There are also other factual disputes that implicate the question of control, including a dispute over whether Velocity Express required the delivery drivers to arrive at the company warehouse at a certain time to sort packages a certain way. Taken together, these factual disputes create a question for the trier of fact as to "whether, as a matter of economic reality, the [delivery drivers] 'are dependent upon the business to which they render service.'" *Sureway Cleaners*, 656 F.2d at 1370 (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)).

## II.    Investment and the Ability to Employ Helpers

This factor considers the extent to which a worker has invested in his or her own business and employees substitutes or helpers, with the understanding that either substantial investment or employment of others suggests that the worker "is in business for himself." *See Velu*, 666 F. Supp. 2d at 307. As discussed above, it is undisputed that delivery drivers were authorized to employ substitute drivers or assistants at their discretion, although the extent to which they actually did so is a disputed issue of fact. It is undisputed, however, that delivery drivers provided their own vehicles and were individually responsible for vehicle maintenance and

---

[5] Notably, the Ninth Circuit rule that a court should consider how a worker acts in reality distinguishes my analysis from that of other jurisdictions that consider whether the worker has a theoretical ability or freedom to act in a certain way. *Compare Sureway Cleaners*, 656 F.2d at 1371, *with Mid-Atlantic Installation Servs.*, 164 F. Supp. 2d at 674 n.5 ("The fact that many Installers choose not to hire helpers does not mean they are controlled by [their employer]. It is their *right* to do so which is relevant.") (emphasis in original).

insurance. (Dent Dep. 108:21-24, 124:12-16; Mace Dep. 77:10-15; Def.'s CSMF (#56) ¶ 25). The vehicles were also used for personal purposes, and at least some of the drivers owned their vehicles prior to working for Velocity Express. (Graham ¶ 11; Rose Decl. ¶ 14; Barton Decl. ¶ 13.) There is no evidence of Velocity Express's capital expenditures in the record, such that Velocity Express's relative expenditures could be compared to that of the drivers. *See Express Sixty-Minutes Delivery*, 161 F. 3d at 304 (comparing the drivers' investment to that of the corporation in the context of concluding that the district court "clearly erred in finding the drivers' relative investment to be significant").

Because the undisputed facts show that the delivery drivers were allowed to employ substitutes and other helpers, and that the drivers essentially "could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another shipping company" in the event their agreement with Velocity Express was terminated, *see Velu*, 666 F. Supp. 2d 307, these two factors weigh in favor of Velocity Express. The company's advantage on the investment factor is slight, however, because the evidence does not suggest that the delivery drivers' investment was substantial. *See Express Sixty-Minutes Delivery*, 161 F.3d at 304 (observing that a drivers' investment in a vehicle "is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes").

### III.    Special Skills and the Workers' Importance to the Business

Courts also consider whether a position requires special skills and whether the service performed is integral to the alleged employer's business. *See, e.g.*, *Sureway Cleaners*, 656 F.2d at 1370. If a position does not require special skill or is integral to the company's business, those facts weigh in favor of finding that an employer-employee relationship exists. *See id.* at 1372; *see*

*also Pilgrim Equip.*, 527 F. 2d at 1314 (reasoning that "routine work which requires industry and efficiency [as opposed to skill and initiative] is not indicative of independence and nonemployee status"). Velocity Express has not identified any particular skill that might be required of a delivery driver and appears to concede that delivery work does not require specialized skill. It is also undisputed that package delivery was an integral component of the business Velocity Express performed during the relevant time period. I agree with Velocity Express's contention that these factors are not dispositive, and I acknowledge that courts throughout the country have found commercial drivers to be independent contractors based on a combination of other factors. At a minimum, however, these two factors cannot support Velocity Express's motion for summary judgment.

### IV.    Degree of Permanence

"Where a worker is employed for a lengthy period of time, the relationship with the employer looks more like an employer-employee relationship." *Harris*, 656 F. Supp. 2d at 1140 (interpreting wage claims under state and federal law). The facts bearing on the degree of employee permanence are largely undisputed, but also weigh evenly in favor of both sides. Overall, therefore, this factor is neutral.

The record reveals that, of the thirty-one drivers who worked in Oregon during the relevant time-period, there were at least thirteen drivers who worked for the company for three years or more, as of May 7, 2010.[6] (Dent Decl. (#55) Ex. 1.) These drivers had an average tenure

---

[6] The thirteen drivers are: Jerry Aydelotte (1/1/2003 - Present); Mary Geck (1/29/2003 - Present); Nadezhda Gonchar (1/1/2001 - 1/11/2008); Vasiliy Gorbunov (10/7/2002 - 6/6/2008); Joyce Jones (9/28/2004 - 12/7/2007); Richard Kangas (4/17/2006 - Present); Larry Lundquist (1/1/2003 - Present); Matt McQuown (1/1/2004 - Present); Ronald Morrison (1/2/2003 - Present); Vera Oliferovskaya (8/21/2000 - 10/29/2009); Donald Scherer (12/5/2002 - Present);

of six years as independent contractors. (*Id.*) Because this calculation accounts only for the time the drivers worked under an independent contractor agreement, the drivers' overall tenure with Velocity Express and its predecessor, Corporate Express was, in some cases, significantly longer than six years. (*See* Dent Dep. 76:11-78:22.) Significantly, four to five of the thirteen long-term drivers were hired as employees before Velocity Express moved to an independent contractor model. (*Id.* at 76:11-17.) Additionally, there are at least four drivers who worked for Velocity Express between two and three years (Dent Decl. (#55) Ex. 1.) In total, over 50% of the Oregon delivery drivers who worked for Velocity Express during the relevant time period were employed longer than two years. (*Id.*) The remaining Oregon drivers were employed for an average of approximately five months. (*Id.*) Because the record shows a relatively even mix of long-term and short-term delivery drivers, these facts do not favor either side.

Generally speaking, the drivers' positions were not ones of permanence, primarily because the drivers' skills and equipment were easily transferrable to other companies. It is undisputed that the delivery drivers worked under fixed-term contracts and had an option to terminate their contracts at will, provided they gave Velocity Express two-weeks notice. (Pl.'s CSMF (#60) Ex. 7 at 5.) These facts favor Velocity Express. However, the Secretary has presented evidence that the drivers understood their contracts to be of indefinite duration (Rose Decl. ¶ 4), and that contracts were routinely renewed without renegotiation (Graham ¶ 4; Dent Dep. 144:2-8). These facts favor the Secretary. *See Pilgrim Equip.*, 527 F.2d at 1314 (noting, in the context of finding that workers were not independent contractors, that the workers' contracts were "for a 1 year duration and . . . routinely renewed"). As mentioned above, there is a dispute of material fact

---

Joseph Sergent (9/22/2005 - 5/29/2009); Yelena Tyshkevich (2/1/2006 - 1/20/2009). The "present" is construed as May 7, 2010—the date of Ms. Dent's declaration.

regarding the extent to which the delivery drivers actually offered their services to other delivery companies while they worked for Velocity Express. (Rose Decl. ¶ 17; Barton Decl. ¶ 15; Mummery Decl. ¶ 18; *see also Sureway Cleaners*, 656 F.2d at 1372 (considering whether workers, in fact, "transfer[red] from one place to another as particular jobs [were] offered to them").)

The undisputed facts do not clearly favor either the Secretary or Velocity Express, and this factor could favor the Secretary if the facts are viewed in the light most favorable to her position.

## CONCLUSION

There are substantial disputes of material fact regarding the extent to which Velocity Express controlled the delivery drivers' manner of work, and there are other disputes of fact scattered throughout the other factors. These factual questions permeate the analysis of defendant's summary judgment motion, particularly when none of the undisputed factors compels a determination that the drivers are independent contractors. *See Bonnetts v. Arctic Express, Inc.*, 7 F. Supp. 2d 977 (S.D. Ohio 1998) (concluding that issues of material fact on the question of employer control precluded summary judgment, despite the court's conclusion that several other factors weighed in favor of finding that the driver was an independent contractor); *accord Harris*, 656 F. Supp. at 1138. Accordingly, Defendant's Motion for Summary Judgment (#48) is DENIED in part and DENIED AS MOOT in part.

IT IS SO ORDERED.

DATED this   12th   day of August, 2010.

/s/ Michael W. Mosman  
MICHAEL W. MOSMAN  
United States District Court